**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

FEDERAL LAW ENFORCEMENT OFFICERS
ASSOCIATION,

                              Plaintiff,

        v.                                                    Civil Action No. 19-735 (CKK)

MARGARET WEICHERT, et al.

                              Defendants.

**PLAINTIFF'S SUPPLEMENTAL BRIEF IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS**

Respectfully submitted,

Ryan E. Griffin, D.C. Bar Number 1007078
Daniel M. Rosenthal, D.C. Bar Number 1010473
James & Hoffman, P.C.
1130 Connecticut Avenue, NW, Suite 950
Washington, DC 20036
(202) 496-0500
(202) 496-0555 (fax)
regriffin@jamhoff.com
dmrosenthal@jamhoff.com

Attorneys for Plaintiff Federal Law Enforcement
Officers Association

Dated: January 13, 2020

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

STATEMENT OF PERTINENT FACTS ............................................................................ 2

ARGUMENT ...................................................................................................................... 6

I.      OPM's interpretation of Section 8421(c) is ripe for review and must be vacated
        because the Agency failed to comply with the APA's notice-and-comment
        requirement ............................................................................................................ 6

        A.      Applicable legal standards ......................................................................... 6

        B.      OPM was required to comply with the APA's notice-and-comment requirement
                because its interpretation of Section 8421(c) constitutes a legislative rule ............ 9

II.     Even if OPM's interpretation of Section 8421(c) were not subject to the APA's notice-
        and-comment requirement, it would nevertheless be ripe for judicial review as a final
        interpretive rule ...................................................................................................... 15

        A.      Applicable legal standards ....................................................................... 15

        B.      OPM's interpretation of Section 8421(c) is indisputably final .............................. 17

CONCLUSION ................................................................................................................. 18

# TABLE OF AUTHORITIES

## Cases

*Air Transp. Ass'n of Am., Inc. v. F.A.A.*, 291 F.3d 49 (D.C. Cir. 2002) ..........................................8

*Ass'n of Flight Attendants v. Huerta*, 785 F.3d 710 (D.C. Cir. 2015) ............................................7

*Bennett v. Spear*, 520 U.S. 154 (1997) ...........................................................................16

*Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627 (D.C. Cir. 2019) ..................................9, 15, 16

*Cent. Tex. Tel. Coop., Inc. v. FCC*, 402 F.3d 205 (D.C. Cir. 2005) .................................................8

*Chamber of Commerce of the U.S. v. DOL*, 174 F.3d 206 (D.C. Cir. 1998) .............................6, 9

*Cmty. Nutrition Inst. v. Young*, 818 F.2d 943 (D.C. Cir. 1987) .......................................................7

*CropLife Am. v. EPA*, 329 F.3d 876 (D.C. Cir. 2003) ...............................................................7, 8

*CSI Aviation Servs., Inc. v. U.S. Dep't of Transp.*,
    637 F.3d 408 (D.C. Cir. 2011) ...........................................................................15, 16, 17

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) .........................................................14

*Guedes v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*,
    920 F.3d 1 (D.C. Cir. 2019) ....................................................................8, 12, 13, 14

*Interport Inc. v. Magaw*, 135 F.3d 826 (D.C. Cir. 1998) ...................................................8, 12, 13

*Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158 (2007) ....................................................12

*Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243 (D.C. Cir. 2014) ..............................................6, 7

*OCONUS DOD Emp. Rotation Action Grp. v. Cohen*, 144 F. Supp. 2d 1 (D.D.C. 2000) ........8, 16

*Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92 (2015) .............................................................14, 15

*Pharm. Research & Mfrs. of Am. v. HHS*, 138 F. Supp. 3d 31 (D.D.C. 2015) .......................15, 16

*Sierra Club v. EPA*, 699 F.3d 530 (D.C. Cir. 2012) .....................................................................9

*State of N.J., Dep't of Envtl. Prot. v. U.S. Envtl. Prot. Agency*,
    626 F.2d 1038 (D.C. Cir. 1980) ...........................................................................7

*Zhang v. U.S. Citizenship & Immigration Servs.*, 344 F. Supp. 3d 32 (D.D.C. 2018) ...................8

**Statutes and Regulations**

5 U.S.C. § 551 *et seq.*................................................................................................6

5 U.S.C. § 551(5) .....................................................................................................14

5 U.S.C. § 551(13) .....................................................................................................6

5 U.S.C. § 553(b)...................................................................................................6, 13

5 U.S.C. § 704..................................................................................................6, 9, 15

5 U.S.C. § 706(2)(A).................................................................................................15

5 U.S.C. § 706(2)(D)..................................................................................................9

5 U.S.C. § 8421(c) ..............................................................................................1, 2, 3

5 U.S.C. § 8461........................................................................................................13

5 C.F.R. § 838.101(a)(2)...........................................................................................11

57 Fed. Reg. 33,570 (July 29, 1992)........................................................................11

**Other Authorities**

U.S. Office of Personnel Management, Office of the Inspector General, Management Advisory
        Report Number L-2018-1, "Review of the U.S. Office of Personnel Management's Non-
        Public Decision to Prospectively and Retroactively Re-Apportion Annuity Supplements"
        (Feb. 5, 2018), available at https://www.opm.gov/our-inspector-
        general/publications/management-advisory-reports/........................................2, 3, 4, 5, 14

Plaintiff Federal Law Enforcement Officers Association ("FLEOA") submits this supplemental brief to address the issues set forth in the Court's November 4, 2019, Order, ECF No. 24. Specifically, the Court requested "additional briefing as to whether or not Defendants were permitted to re-interpret their obligations pursuant to the [Federal Employee Retirement System ("FERS")] statute without engaging in a rulemaking process." *Id.* at 1. The Court further asked that "[t]he parties [] explain what indicia signal whether the 2016 supplemental annuity payment policy is the type of statutory re-interpretation that does or does not require a rulemaking process." *Id.*

In 2016, Defendant Office of Personnel Management ("OPM") began for the first time to apportion a percentage of a retiree's Annuity Supplement to his or her former spouse any time a divorce court orders division of the retiree's FERS benefits, regardless of whether the relevant order expressly addresses the Annuity Supplement. *See* Compl., ECF No. 1, ¶¶ 15–17; Pl's. Mem. Opp., ECF No. 14, at 2. Documents produced by Defendants pursuant to the Court's November 4 Order confirm that this policy, based on the Agency's interpretation of 5 U.S.C. § 8421(c), constitutes a "legislative rule" under the Administrative Procedure Act ("APA") because it eliminated agency discretion and immediately affected the legal rights of regulated parties—that is, the class of current and future divorced retirees whose retirement benefits have been or will be substantially reduced under the Agency's new policy.

OPM was therefore obligated to undertake notice-and-comment rulemaking under the APA. And because it failed to do so, the Court must not only deny Defendants' Motion to Dismiss, but must vacate the Agency's action on this procedural basis alone.

Even if this policy were not a legislative rule requiring notice-and-comment rulemaking, moreover, it would nevertheless be subject to judicial review as an "interpretive rule" under the

1

familiar "arbitrary, capricious, or contrary to law" standard. This is because the policy at issue—which OPM has now consistently applied for over three years—constitutes "final agency action" with respect to its subject matter.

Thus, the Court should deny Defendants' motion to dismiss and vacate the Agency's action for failure to conduct notice-and-comment rulemaking. Alternatively, the Court should set further proceedings regarding whether OPM's action was arbitrary, capricious, or contrary to law.

**STATEMENT OF PERTINENT FACTS**[1]

According to a June 28, 2016, Retirement and Insurance Letter issued by OPM's Deputy Associate Director of Retirement Operations, OPM, from the inception of FERS until 2016, did not apportion a retiree's Annuity Supplement to his or her former spouse when dividing the retiree's Basic Annuity pursuant to a divorce court order. *See* Ret. and Ins. Ltr. 2016-12 (Ex. E to Griffin Decl.), at 1. Thus when presented with a divorce decree ordering division of a retiree's gross FERS benefits, for example, OPM would divide *only* the Basic Annuity. *See id*. at 2. There is no indication in the documents produced by the Government that this longstanding practice

---

[1] The documents cited in this section were produced to FLEOA's counsel by Defendants pursuant to the Court's November 4, 2019, Order. According to Defendants, these documents constitute "certain documents pertaining to requests for internal guidance and guidance given relating to the proper application of 5 U.S.C. § 8421(c) . . . ." *See* Declaration of Ryan Griffin, attached hereto as Ex. 1, ¶ 2.  The facts recited below are in accord with those pleaded in FLEOA's Complaint as well as those found by OPM's Inspector General in that office's review of this issue. *See* U.S. Office of Personnel Management, Office of the Inspector General, Management Advisory Report Number L-2018-1, "Review of the U.S. Office of Personnel Management's Non-Public Decision to Prospectively and Retroactively Re-Apportion Annuity Supplements" (Feb. 5, 2018), at 8 ("OIG Report"), available at https://www.opm.gov/our-inspector-general/publications/management-advisory-reports/.

arose out of any formal agency rule or policy or specific Agency interpretation of 5 U.S.C.

§ 8421(c).

Starting on August 1, 2016, OPM updated its computer system such that a retiree's

Annuity Supplement would automatically be included in OPM's apportionment of benefits to a

former spouse any time it was dividing a retiree's Basic Annuity. *See id.* at 2. In other words, as

of that date, OPM began construing divorce court orders that it had previously interpreted as

calling for division of a retiree's Basic Annuity only—again, a divorce decree simply ordering

division of a retiree's gross FERS benefits, for example—as mandating division of *both* the

Basic Annuity and the Annuity Supplement. As of late 2016, OPM had apparently identified at

least 595 annuitants who were affected by this change, *see* OIG Report at 1, at least some of

whom were FLEOA members. *See* Compl. ¶¶ 21–23; Decl. of Edmund Toomey, Ex. 1 to Pl's.

Opp. to Defs.' Mot. Dismiss, ECF No. 14-1; Decl. of Nathan Catura, Ex. 2 to Pl's. Opp. to Defs.'

Mot. Dismiss, ECF No. 14-2.

As explained in the Retirement and Insurance Letter, the only exception to this new

policy of always dividing the Annuity Supplement along with the Basic Annuity "would be if the

court order expressly excludes the FERS annuity supplement from the computation of the former

spouse's share." *See* Ret. and Ins. Ltr. 2016-12, at 1. In such circumstances, OPM will apparently

honor the express direction of the divorce court and divide the Basic Annuity only.

OPM also implemented this rule retroactively, at least with respect to retirees who

continued to receive Annuity Supplement payments as of August 2016, by instructing its

paralegals to manually calculate retroactive overpayments (to the retiree) and resulting

underpayments (to his or her former spouse) going back to the date on which a retiree's Annuity

Supplement was first paid or the relevant court order was received by OPM. *Id.* at 3. OPM then

began recouping such "overpayments" by deducting monthly installments against these newly created debts from retirees' monthly benefits going forward. *See* Compl. ¶¶ 18–19; *see also* OIG Report at 2–3 (reviewing four specific cases of affected retirees with retroactive debts of up to $28,389.96); Toomey Decl. ¶¶ 5–10 (explaining that his retirement income fell nearly $900/month after OPM began apportioning 50% of his Annuity Supplement to his former spouse and began deducting monthly installments against the more than $11,000 it decided he owed his former spouse retroactively). There is no indication that OPM applied its new policy retroactively to retirees whose Basic Annuities but not Annuity Supplements were divided prior to August 1, 2016, but who were no longer receiving the Annuity Supplement as of that date (*e.g.*, because they had already reached age 62, at which time the Annuity Supplement benefit expires).[2] *See* OIG Report at 1 (quoting the Agency as stating that it had "identified 595 of our 2.6 million annuitants and survivors *who are currently receiving the FERS Annuity Supplement and are subject to the terms of a state court order*" (emphasis added)).

This fundamental change was apparently sparked by two internal requests for guidance from OPM's Court Ordered Benefits Branch ("COBB"), which administers the benefit payments in question, to its Retirement Policy division in 2011 and 2012. *See* January 19, 2011 Request for Guidance (Ex. B to Griffin Decl.); July 20, 2012 Request for Guidance (Ex. C to Griffin Decl.). According to these requests, OPM had begun receiving an increasing number of court orders expressly dividing the Annuity Supplement. Due to the apparent lack of any agency rule or regulation dictating whether the Supplement was divisible, the paralegals tasked with processing

---

[2] For example, it appears that a retiree who received his full Annuity Supplement from 2008 to 2015 while his Basic Annuity was being apportioned to his former spouse was subject to retroactive recalculation of benefits, yet an otherwise identically situated retiree who retired in 2010 and was scheduled to receive an Annuity Supplement until 2017 would be subject to recalculation and retroactive debt for the period from 2010 to August 1, 2016.

these benefits took diverging approaches when applying these court orders. Some would honor a court-ordered division of an Annuity Supplement on the basis that there was no provision in the regulations prohibiting such a division. *See* 2011 Request for Guidance. Others would decline to do so, however, on the basis that the Annuity Supplement benefit replaces Social Security income for certain early retirees and that Social Security benefits are non-divisible in a divorce. *See id.*; *see also* Compl. ¶ 8 (explaining the purpose of the Annuity Supplement); OIG Report at 5 (citing an OPM handbook to explain that "[b]ecause LEOs retire before they are eligible for Social Security benefits, they are entitled to receive an Annuity Supplement in addition to their Basic Annuity. . . . The Annuity Supplement 'approximates the value of FERS service in a Social Security benefit. The general purpose [] is to provide a level of income before age 62 similar to what the retiree will receive at age 62.'").

In response to these Requests for Guidance, OPM's Manager of Retirement Policy and Retirement Services issued a memorandum dated October 23, 2014, explaining that Retirement Policy had determined in consultation with the Agency's Office of General Counsel that Section 8421(c) not only required it to honor a court-ordered division of an Annuity Supplement, but also to divide an Annuity Supplement any time a "court order does not expressly divide the FERS annuity supplement but expressly divides a retiree's FERS annuity." *See* Mem. from Jim Guiseppe re: OS Clearinghouse 359 and Unnumbered Request; Division of FERS Annuity Supplement ("Guiseppe Memo") (Ex. D to Griffin Decl.), at 1, 3–4.[3] The Guiseppe Memo did not address whether the change in the Agency's processing of divorce court orders with respect to the Annuity Supplement was to have retroactive effect; whether retroactivity was required by

---

[3] The Government maintains this position—that Section 8421(c) unambiguously compels its actions—in this litigation. *See* Defs.' Mot. Dismiss, ECF No. 12, at 9–10.

the Agency's interpretation of Section 8421(c); or whether the Agency had legal authority for

making such a change retroactively.

It appears that the policy changes contemplated by the Guiseppe Memo were put into

effect by the 2016 Retirement and Insurance Letter discussed above. At no point did OPM

provide public notice or opportunity for comment before implementing these changes. *See*

Compl. ¶ 20.

## ARGUMENT

**I.**     **OPM's interpretation of Section 8421(c) is ripe for review and must be vacated because the Agency failed to comply with the APA's notice-and-comment requirement.**

### A.     Applicable legal standards.

The APA, 5 U.S.C. § 551 *et seq.*, broadly permits judicial review of "final agency

action." *See* 5 U.S.C. § 704. An agency rule is considered "agency action." *Id.* § 551(13).

Agency action under the APA can generally be placed into two categories: legislative

rules, *i.e.*, those that have "the force and effect of law," and non-legislative rules, *i.e.*, interpretive

rules, procedural rules, and general statements of policy that neither establish binding norms nor

alter the rights and obligations of parties. *See Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243,

251 (D.C. Cir. 2014) (explaining the distinction between legislative rules and non-legislative

rules such as interpretive rules and general statements of policy); *Chamber of Commerce of the*

*U.S. v. DOL*, 174 F.3d 206, 211–13 (D.C. Cir. 1998) (distinguishing non-legislative procedural

rules and general statements of policy from "substantive," *i.e.* legislative, rules). Legislative rules

are subject to the notice-and-comment requirement set forth in the APA; non-legislative rules are

exempt from this requirement, although they still may be overturned if they are arbitrary,

capricious, or contrary to law. *See* 5 U.S.C. § 553(b); *see also Nat'l Mining*, 758 F.3d at 250; *see*

*infra* at 15. To achieve the purposes of APA Section 553(b), the non-legislative rule exemptions

"are to be 'narrowly construed and only reluctantly countenanced.'" *Zhang v. U.S. Citizenship &*
*Immigration Servs.*, 344 F. Supp. 3d 32, 57 (D.D.C. 2018) (quoting *State of N.J., Dep't of Envtl.*
*Prot. v. U.S. Envtl. Prot. Agency*, 626 F.2d 1038, 1045 (D.C. Cir. 1980)).

The most important factor in differentiating between legislative and non-legislative rules
is "the actual legal effect (or lack thereof) of the agency action in question on regulated entities."
*Nat'l Mining*, 758 F.3d at 252. Put another way, if the action "creates new rights or imposes new
obligations on regulated parties or narrowly limits administrative discretion," then it constitutes a
legislative rule. *Ass'n of Flight Attendants v. Huerta*, 785 F.3d 710, 717 (D.C. Cir. 2015) (citing
*Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 948 (D.C. Cir. 1987)).

The language used by the agency *in the substance of a rule* is also an important
consideration; "a document that reads like an edict is likely to be binding, while one riddled with
caveats is not." *Ass'n of Flight Attendants*, 785 F.3d at 717; *see also CropLife Am. v. EPA*, 329
F.3d 876, 881–83 (D.C. Cir. 2003) (holding that press release announcing that agency would no
longer consider human studies on a case-by-case basis in evaluating pesticide safety constituted a
legislative rule because it left no room for future discretion); *Zhang*, 344 F. Supp. 3d at 59
(finding that an agency's regulatory interpretation which stated what the agency "must" and
"will" do is a legislative rule because it creates a "binding norm that is finally determinative of
the issues or rights to which it is addressed" (quoting *CropLife Am.*, 329 F.3d at 881)).

That said, a rule's practical effect is more important than its formal characteristics or any
label that might be attached by the agency. *See Zhang*, 344 F. Supp. 3d at 58. Thus a court
"cannot accept an agency's characterization of its own action," but instead "must make this
determination itself" because "it is well established that an agency may not label a substantive
change to a rule an interpretation simply to avoid the notice and comment requirements." *Id.* at

58 (quoting *Air Transp. Ass'n of Am., Inc. v. F.A.A.*, 291 F.3d 49, 55 (D.C. Cir. 2002)); *cf.*

*OCONUS DOD Emp. Rotation Action Grp. v. Cohen*, 144 F. Supp. 2d 1, 6 (D.D.C. 2000) (noting

that if an agency's own labels were conclusive, "every federal agency could insulate its policies

from judicial review by simply designating them as 'draft' and never 'finally' adopting them").

Accordingly, a rule that "effects a substantive regulatory change to the statutory or regulatory

regime" is legislative even if an agency does not formally invoke its legislative authority and

does not publish the rule in the Federal Register. *Zhang*, 344 F. Supp. 3d at 58–59 (finding

agency's rule to be legislative notwithstanding its failure to publish it or invoke its rulemaking

authority); *see also CropLife Am. v. EPA*, 329 F.3d at 881 (determining that agency's press

release established a "binding norm that is finally determinative of the issues or rights to which it

is addressed.").

Finally, a rule that interprets a statute is not rendered a non-legislative interpretive rule on

that basis alone; instead, the APA contemplates that all types of rules can interpret law. *See Cent.

Tex. Tel. Coop., Inc. v. FCC*, 402 F.3d 205, 212 (D.C. Cir. 2005). The question regarding a

legislative rule, however, is whether it interprets law in a way that "directly govern[s] the

conduct of members of the public, affecting individual rights and obligations." *Guedes v. Bureau

of Alcohol, Tobacco, Firearms, & Explosives*, 920 F.3d 1, 18 (D.C. Cir. 2019) (finding that rule

interpreting a term in the Gun Control Act as prohibiting ownership of bump-stock devices was

legislative) (internal quotation omitted). An interpretive rule, on the other hand, imposes no new

obligations and determines no legal rights; rather, it explains a pre-existing obligation. *See

Interport Inc. v. Magaw*, 135 F.3d 826, 829 (D.C. Cir. 1998) (finding that rule dictating how the

agency would enforce statutory requirement was interpretive).

A legislative rule is necessarily "final agency action" for purposes of the APA. *Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 635 (D.C. Cir. 2019); 5 U.S.C. § 704. Accordingly, a legislative rule that was not implemented through the required notice-and-comment procedure is not only subject to judicial review, but must be vacated on that basis. *See, e.g.*, *Sierra Club v. EPA*, 699 F.3d 530, 535 (D.C. Cir. 2012) (determining that agency's action was legislative in nature and remanding to the agency to fulfil the required notice-and-comment procedures); *Chamber of Commerce*, 174 F.3d at 213 (same); *see also* 5 U.S.C. § 706(2)(D) (the reviewing court can "hold unlawful and set aside agency action . . . found to be . . . without observance of procedure required by law").

### B. OPM was required to comply with the APA's notice-and-comment requirement because its interpretation of Section 8421(c) constitutes a legislative rule.

FLEOA alleges in Count II of its Complaint that OPM was obligated to engage in notice-and-comment rulemaking under the APA because its interpretation of Section 8421(c) constituted a legislative rule with the force and effect of law. *See* Compl. ¶¶ 33–39. OPM's policy has the force and effect of law because it had an immediate substantive effect on the rights and obligations of divorced retirees, removed OPM's discretion with respect to applying court orders dividing FERS benefits generally without express reference to the Annuity Supplement, and amounted to a substantive change of the regulatory scheme.

First, OPM's interpretation of Section 8421(c) had an immediate and direct adverse effect on the rights and obligations—not to mention the finances—of affected retirees. Specifically, as explained above, retirees who prior to August 1, 2016, had their Basic Annuities but not their Annuity Supplements divided pursuant to divorce orders dividing FERS benefits generally without express reference to the Annuity Supplement saw a percentage of their Annuity Supplements automatically redirected to their former spouses. *See supra* at 3–4. Not only that,

but many such retirees were immediately placed in substantial debt to their ex-spouses as a result of OPM's new policy and thus subject to additional reductions to their monthly retirement income as "repayment" of this debt. *See supra* at 3–4.

A second category of individuals—still-active employees who will be eligible for the Annuity Supplement upon their retirement and who have divorce court orders providing for the future division of their FERS benefits without specific reference to the Annuity Supplement— were likewise immediately affected. Specifically, such employees suffered a reduction in their entitlement to future benefits even though that would not have been the effect of their divorce order at the time it was issued. Put another way, OPM's rule worked an immediate change in the legal effect of these retirees' divorce decrees even though the financial consequences of that change will not accrue until the employees retire.

The next indication that OPM's rule is legislative is the fact that it completely eliminated the Agency's discretion to determine the meaning of divorce court orders with respect to retirees' Annuity Supplements in individual cases. The mandatory language of OPM's determination is indicative of its intent to remove this discretion; per the Guiseppe Memo, OPM "must" now apportion the Annuity Supplement to a former spouse any time it divides a FERS benefit unless the pertinent divorce court order explicitly exempts the Annuity Supplement from such division. *See supra* at 5. This stands in stark contrast to the *status quo ante* in which Agency paralegals processing court-ordered divisions apparently determined in individual cases whether the divorce court intended to divide a retiree's Annuity Supplement. *See supra* at 2–3.

In short, OPM's rule is legislative because it effects a substantive change to OPM's existing regulatory scheme that determines with finality the rights to which it is addressed.

Notably, the preexisting regulations guiding OPM's application of court orders provide as follows:

> In executing court orders . . . , OPM must honor the clear instructions of the court. Instructions must be specific and unambiguous. OPM will not supply missing provisions, interpret ambiguous language, or clarify the court's intent by researching individual State laws. In carrying out the court's instructions, OPM performs purely ministerial actions in accordance with these regulations. Disagreement between the parties concerning the validity or the provisions of any court order must be resolved by the court.

5 C.F.R. § 838.101(a)(2). As OPM itself explained in promulgating this regulation through the notice-and-comment process, the purpose of this provision and those that accompany it was "to honor the decisions of State courts" in order to effectuate "the intent of Congress[,] [which] was that the Federal Government not insert itself into marital property disputes." *See* 57 Fed. Reg. 33,570, 33,570 (July 29, 1992).

Prior to August 1, 2016, OPM acted consistently with both the text of this regulation and its stated purpose by not apportioning a retiree's Annuity Supplement pursuant to a court order which merely divided his or her "FERS benefits" or "FERS annuity" generally on the theory that such language did not constitute "specific and unambiguous" direction to do so. *See supra* at 2–3. On that date, however, OPM *sua sponte* altered the legal effect of hundreds of preexisting state divorce court orders *en masse*—hardly the type of "purely ministerial" action contemplated by its own regulation. And it did so by doing precisely what its own regulation ostensibly forbade—interpreting (or rather, reinterpreting) language in these court orders that is at best facially ambiguous with respect to division of retirees' Annuity Supplements. In short, OPM did not merely announce how it would interpret Section 8421(c) going forward, but instead directly and immediately decided the rights of those current and future retirees affected by that interpretation.

11

The legislative nature of OPM's rule is confirmed by its parallels to the rule at issue in *Guedes*—a quintessential legislative rule—and its dissimilarity to that of *Interport*—a clearly interpretive rule. *Guedes* involved a Bureau of Alcohol, Tobacco, and Firearms ("BATF") rule defining the statutory term "machinegun"—a class of fully automatic weapons generally prohibited under federal law—to include a semiautomatic weapon outfitted with a so-called bump-stock-type device, which enables it to mimic the performance of a fully automatic weapon. *Guedes*, 920 F.3d at 7. The D.C. Circuit, in examining for purposes of *Chevron* deference whether this rule was legislative or interpretive, found that "[a]ll pertinent indicia of agency intent confirm[ed]" that it was legislative in nature. *Id.* at 18. Most importantly in the court's view, the Bump-Stock Rule immediately and directly adjusted the rights and obligations of bump-stock owners by making possession of a previously legal bump-stock device illegal as of the effective date. *Id.* As the court explained, this fact constituted "powerful evidence that the Bureau 'intended [the Rule] as a binding application of its rulemaking authority.'" *Id.* (quoting *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158,172 (2007)).

On the other end of the spectrum, *Interport* involved a BATF rule requiring an importer seeking to import firearms out of a Foreign Trade Zone for government use to submit a purchase order showing that the government is the purchaser of the firearms. *Interport*, 135 F.3d at 827. The court, in finding this rule to be interpretive, pointed out that the statute to which it pertained already required that such firearms be purchased by the Government and that the applicable regulations stated that the firearms importer has the burden of "establish[ing] to the satisfaction of the Director" that the firearms will be used in accordance with the statute. *Id.* at 829 (alterations in original). Thus the purchase order rule did not impose new obligations or

determine legal rights; it simply explained the form of evidence required under the preexisting rule. *Id.*

OPM's rule shares much of the same "powerful evidence" that the D.C. Circuit identified in *Guedes*. Namely, it directly adjusted the rights of divorced retirees whose divorce agreements do not call for the division of the Annuity Supplement: their retirement benefits were immediately reduced going forward and, in many cases, they became suddenly indebted to their former spouses in a way that further reduced their retirement benefits. *See supra* at 3–4; *cf. Guedes*, 920 F.3d at 18 (noting that BATF rule required bump-stock owners to relinquish or destroy their devices in order to be in compliance with the rule). In fact, it created this new legal obligation in the same exact way that the BATF created the Bump-Stock Rule in *Guedes*: by interpreting the language of a statute which it had been expressly delegated by Congress to administer. *See Guedes*, 920 F.3d at 8; 5 U.S.C § 8461 (delegating to OPM the authority to administer FERS). Additionally, OPM's rule substantively determined the outcome of future retirement applications—the Annuity Supplement will be divided any time FERS benefits generally are divided—unlike the interpretive rule in *Interport*, which made no proclamation about whether any future permit request would be approved but instead simply explained the agency's decisionmaking process with respect to a requirement that already existed in the relevant statute.

Defendants may argue that notice-and-comment rulemaking was not required because Section 8421(c) has always required OPM to include the Annuity Supplement when dividing a retiree's Basic Annuity. *See supra* at 5. This argument fails for at least three reasons. First, there is no exception to the notice-and-comment process for correcting agency mistakes of law. *See* 5 U.S.C. § 553(b). Quite the opposite—where a rule is legislative in nature, the APA requires

notice-and-comment rulemaking to repeal or amend rules as well as to make them in the first instance. *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015) ("[T]he D.C. Circuit correctly read § 2 of the APA [5 U.S.C. § 551(5)] to mandate that agencies use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance." (citing *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009))).

Second, Defendants cannot simply rewrite history to ignore decades of consistent agency practice prior to 2016. *See Guedes* 920 F.3d at 19–20 (rejecting agency's contention that the relevant statute had always prohibited ownership of bump-stock devices in light of the agency's longstanding position to the contrary). Indeed, given that OPM is apparently only applying its new rule retroactively to divorced retirees who are currently receiving an Annuity Supplement, and not to divorced retirees who previously received an Annuity Supplement but reached Social Security age prior to 2016, there is necessarily still an inflection point in the Agency's historic practice—and thus in its interpretation of Section 8421(c)—regardless of its efforts to apply its new rule retroactively. *See* OIG Report at 7 (observing with respect to OPM's internal guidance that "[n]*one* of these publications—which have been available for almost two decades—suggest that the Basic Annuity is to be considered synonymous with the Annuity Supplement or that the Annuity Supplement may be apportioned.").

Third, any argument that OPM's actions are consistent with Section 8421(c) is premature given that this is the precise merits question raised by Count I of FLEOA's Complaint, *see* Compl. ¶¶ 27–32, a question deserving of full merits briefing not appropriate at this preliminary stage of the litigation. Fortunately, as the precedents above make clear, the Court need not reach this question in order to resolve the antecedent issue of whether OPM was required to engage in

notice-and-comment rulemaking, which turns on the *effect* of the rule at issue, not on whether the rule is substantively compliant with the relevant statute. *See supra* at 7.

To sum up, OPM's interpretation of Section 8421(c) is a binding legal rule that adversely impacted the rights and obligations of affected retirees, eliminated agency discretion, and substantively altered the preexisting regulatory scheme. Accordingly, it is a legislative rule subject to the APA's notice-and-comment procedures and to this Court's review. And because the Agency failed to comply with those requirements, the rule must be vacated.

**II.    Even if OPM's interpretation of Section 8421(c) were not subject to the APA's notice-and-comment requirement, it would nevertheless be ripe for judicial review as a final interpretive rule.**

**A.    Applicable legal standards.**

Interpretive rules, though not subject to the rulemaking requirement, may still be reviewed upon other bases, including that they are arbitrary, capricious, or contrary to law, so long as they constitute final agency action. *See* 5 U.S.C. §§ 704, 706(2)(A); *Pharm. Research & Mfrs. of Am. v. HHS*, 138 F. Supp. 3d 31, 40 (D.D.C. 2015) ("'[A]n agency may not avoid judicial review merely by choosing' . . . a purportedly non-binding Interpretive Rule[] 'to express its definitive position on a general question of statutory interpretation.'" (quoting *CSI Aviation Servs., Inc. v. U.S. Dep't of Transp.*, 637 F.3d 408, 412 (D.C. Cir. 2011))); *see also Cal. Cmtys.*, 934 F.3d at 635 (reading *Perez v. Mortg. Bankers Ass'n* as confirmation that "should an agency—perhaps to evade notice and comment—repudiate a longstanding interpretive rule by way of a second interpretive rule . . . , an affected party can seek judicial review pursuant to the APA.").

An interpretive rule is final, and thus reviewable, when two factors are met. "First, the action must mark the consummation of the agency's decisionmaking process . . . ." *Pharm.*

*Research*, 138 F. Supp. 3d at 40 (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)) (internal quotations omitted). An agency's interpretation of a statute necessarily marks the "consummation" of its decisionmaking process when "it advances what [the agency] believes is the only permissible interpretation of the statute." *Cal. Cmtys.*, 934 F.3d at 636. Similarly, finality exists where an agency gives "no indication that [its action is] subject to further agency consideration or possible modification." *Pharm. Research*, 138 F. Supp. 3d at 43 (quoting *CSI Aviation Servs.*, 637 F.3d at 412). And even where an agency attempts to convey non-finality through labels such as "draft," for example, the fact that the agency has consistently applied such a policy over a period of time will counsel in favor of finality. *See OCONUS DOD*, 144 F. Supp. 2d at 6 (noting that the agency's "draft" policy had been in effect without change for more than three years).

Second, "the action must be one by which rights or obligations have been determined or from which legal consequences will flow." *Pharm. Research*, 138 F. Supp. 3d at 40 (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)). In assessing this factor, a court must look to "the concrete consequences an agency action has or does not have as a result of the specific statutes and regulations that govern it." *See Cal. Cmtys.*, 934 F.3d at 637. For example, an interpretive rule promulgated as such or contained in an agency's pre-enforcement letter to a regulated party may be sufficiently final to trigger judicial review where it leaves the regulated party with little choice but to comply with the agency's interpretation or face significant consequences in a future enforcement proceeding. *See Pharm. Research*, 138 F. Supp. 3d at 46 ("Most tellingly, however, is the fact that HHS contends that failure to comply with the statutory requirements—as interpreted by its Interpretive Rule—will expose manufacturers to significant penalties in future enforcement proceedings." (citation omitted)); *see also CSI Aviation Servs.*, 637 F.3d at 412

16

(noting that regulated parties faced a "painful choice between costly compliance and the risk of prosecution at an uncertain point in the future").

**B.      OPM's interpretation of Section 8421(c) is indisputably final.**

FLEOA alleges in Count I of its Complaint that OPM acted arbitrarily, capriciously, and contrary to the relevant statutory provision. *See* Compl. ¶¶ 27–32. OPM's interpretation of Section 8421(c), even if not legislative, is undoubtedly final under the two-part test from *Pharmaceutical Research* and thus ripe for review under this standard. *See supra* at 15–16. First, every indicia points to it being the "consummation" of the agency's decisionmaking process: it advances what OPM asserts is a mandatory construction of the statutory provision; it leaves no room for, and gives no contemplation to the possibility of, further consideration; and it has now been in effect without alteration for more than three years. *See supra* at 3.

Second, as explained above in Part I.B., OPM's interpretation of Section 8421(c) has indisputably already determined the legal rights and obligations of affected retirees. Specifically, as of August 1, 2016, those divorced retirees whose Basic Annuities but not Annuity Supplements were being divided pursuant to divorce court orders that did not expressly divide the Annuity Supplement not only saw their monthly benefits cut going forward, but also faced immediate liabilities for retroactive adjustments that they had no choice but to repay through deductions from future benefits unilaterally implemented by OPM. *See supra* at 3–4. In short, the case for finality here is even stronger than in pre-enforcement cases like *Pharmaceutical Research* and *CSI Aviation*, where the regulated parties at least retained some choice, even if painful, regarding compliance with a disputed agency rule.

In sum, OPM has not only unequivocally decided that Section 8421(c) requires it to divide a retiree's Annuity Supplement any time a court order divides his or her FERS annuity

generally, but has in fact done so to the substantial financial detriment of affected retirees. Its action is thus final for purposes of the APA and therefore reviewable in this Court.

## CONCLUSION

For the foregoing reasons, the Court should find that OPM's interpretation of Section 8421(c) constitutes a judicially reviewable legislative rule promulgated in violation of the notice-and-comment requirements of the APA. It should therefore deny Defendants' Motion to Dismiss and vacate the Agency's rule. Alternatively, the Court should find that OPM's interpretation constitutes a final interpretive rule ripe for judicial review and should deny Defendants' Motion to Dismiss on this basis and allow the parties to proceed to the merits of whether the Agency's interpretation is arbitrary, capricious, or contrary to law.

Dated: January 13, 2020                    Respectfully submitted,

                                           /s/ Ryan E. Griffin
                                           Ryan E. Griffin, D.C. Bar Number 1007078
                                           Daniel M. Rosenthal, D.C. Bar Number 1010473
                                           James & Hoffman, P.C.
                                           1130 Connecticut Avenue, NW, Suite 950
                                           Washington, DC 20036
                                           (202) 496-0500
                                           (202) 496-0555 (fax)
                                           regriffin@jamhoff.com
                                           dmrosenthal@jamhoff.com

                                           *Counsel for Plaintiff Federal Law
                                           Enforcement Officers Association*