# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FEDERAL LAW ENFORCEMENT<br>OFFICERS ASSOCIATION,<br><br>                                Plaintiff,<br><br>v.<br><br>DALE CABANISS, et al.,<br><br>                                Defendants. | Civil Action No. 19-735 (CKK) |

## **DEFENDANTS' CROSS-REPLY TO PLAINTIFF'S SUPPLEMENTAL BRIEF**

## INTRODUCTION

Defendant submits this reply to Plaintiff Federal Law Enforcement Officers Association's ("FLEOA's") Supplemental Brief in Opposition to Defendants' Motion to Dismiss ("Pl. Supp. Br."). In its November 4, 2019 Memorandum Opinion, the Court asked the parties to address, among other things, whether OPM's actions should be treated as a rule and what indicia signal whether OPM's corrective actions required OPM to follow a rulemaking process, and asked FLEOA to cite cases in which courts have agreed to treat "statutory reinterpretations as rules."

In Defendants' Supplemental Brief ("Def. Supp. Br."), defendants discussed the circumstances underlying the issuance of OPM's Section 8421(c) internal guidance, Def. Supp. Br. at 8-13, and demonstrated the flaws in FLEOA's argument that OPM could not issue this guidance without notice-and-comment rulemaking. Id. at 14-24. FLEOA's Supplemental Brief fails to point to analogous cases where such actions have been held to require notice-and-comment rulemaking. Moreover, the fallback relief that FLEOA seeks – that the Court treat OPM's actions as an interpretive rule and overturn them as arbitrary, capricious, or contrary to

law – asks for relief identical to that which can be provided under the Civil Service Reform Act ("CSRA") and should thus be denied for lack of jurisdiction. Because FLEOA has failed to present a cognizable APA claim before this Court, FLEOA's claims should be precluded under 5 U.S.C. § 704 as barred by the exclusive claims channeling provisions under the CSRA.

## ARGUMENT

OPM was not required to engage in notice-and-comment rulemaking in order for management to issue corrective guidance and take corrective action where claims arising from staff's actions in retirement matters are governed by the CSRA, and FLEOA failed to demonstrate that the instant case is the type that could conceivably fall under the narrow exception that 5 U.S.C. § 702(2)(D) provides to the otherwise comprehensive and exclusive CSRA channeling scheme. In addition, OPM's corrective actions do not constitute unauthorized retroactive rulemaking, because OPM merely applied, as written, a statute it is obligated to administer and, in furtherance of its obligations, directed corrective actions when it discovered erroneous calculations. The result of that application was the issuance of two internal written guidances consisting of (1) a Clearinghouse Memorandum, and (2) a Retirement and Insurance Letter ("RIL"), which simply communicated to relevant operational staff OPM's reading of the clear language of 5 U.S.C. § 8421(c). And even if the Court were to conclude that this internal agency guidance constituted a rule, OPM's actions still would not be reviewable in district court; they at most would constitute an interpretive rule for which notice-and-comment rulemaking is not required. Indeed, even if the Court were inclined to conclude in that instance that OPM's actions were arbitrary, capricious, or contrary to law, jurisdiction still would not exist under the CSRA, because such relief is precisely the type of relief already available under the CSRA, and the CSRA provides an exclusive claim channeling path for obtaining that relief.

I. **OPM's issuance of corrective guidance and taking of corrective actions did not require notice-and-comment rulemaking.**

As explained in defendants' Supplemental Brief, the APA does not require agencies to promulgate a rule in circumstances when a statute is clear on its face and has not left an interpretative gap for an agency to fill. Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-843 (1984). Furthermore, the APA does not require agencies to undertake notice-and-comment rulemaking when the agency has issued an "interpretive rule" or issued a "general statement of procedure." 5 U.S.C § 533(b)(A); Perez v. Mortgage Bankers Association, 575 U.S. 92, 96 (2015). The APA only requires that agencies promulgate rules under notice-and-comment rulemaking when their actions constitute "legislative rulemaking," wherein agencies create new rights and obligations for individuals or entities that have the force and effect of law. Perez, 575 U.S. at 96.

As explained in OPM's Supplemental Brief, OPM's actions in issuing internal guidance setting forth OPM's reading of the plain language of 5 U.S.C. § 8421(c) and directing subsequent corrective actions did not constitute a legislative rule and thus did not require OPM to engage in a notice-and comment process. OPM's Clearinghouse Memorandum and RIL were triggered not by a desire by the Director or other management officials to change existing law, but rather by staff in OPM's Court Ordered Benefits Branch ("COBB") requesting guidance from management about how such staff should apply 5 U.S.C. § 8421(c). As a result, OPM's management became aware that COBB staff had inconsistent understandings of what Section 8421(c) meant and how it should be applied. Accordingly, OPM issued its Clearinghouse Memorandum and RIL exclusively to its employees for the purpose of reiterating the clear provisions of 5 U.S.C. § 8421(c) and 5 C.F.R. § 838.103, and to provide employees guidance on

what corrective actions they must take in situations where OPM had not acted in accordance with existing law.

In its Supplementary Brief ("Pl. Supp. Br."), FLEOA argues that these actions constituted the creation of a legislative rule because they created new rights or imposed new obligations, left no room for discretion, and effectuated a substantive change. Pl. Supp. Br. at 7-8.  OPM did not intend that its actions create new rights or impose new obligations on the individuals affected by 5 U.S.C. § 8421(c).  OPM simply directed COBB staff to act in accordance with *existing* rights and obligations under the existing statute.  OPM let the text of the statute do the work and did not add new considerations to that text.  Similarly, OPM was not "limiting discretion" of its employees here, because there was no discretion to limit.  The statutory provision under 5 U.S.C. § 8421(c) provided the exclusive contours within which COBB staff were required to operate, and OPM's Clearinghouse Memorandum and RIL did not alter in any way those pre-existing statutory requirements.[1]

In his Clearinghouse Memorandum, Mr. Giuseppe, observing that the statute was clear on its face, directed COBB staff to apply the statute *as written*.  It was to the text of the statute – not changed circumstances, difficulties in obtaining compliance, or the other sorts of considerations

---

[1] FLEOA's argument that OPM's instruction conflicted with its regulations instructing OPM employees to implement apportionment orders as written is unavailing because state court orders must, themselves, be applied in accordance with operative Federal statutes, and state courts, like members of the public, are deemed to have notice of, and are expected to be governed by, those statutes in issuing apportionment orders, to the extent they address such orders.  The publication of a statutory provision, such as Section 8421(c), in the United States Code is sufficient to put the public – and these annuitants and spouses -- on notice of both the existence of the statute and its effect. Atkins v. Parker, 472 U.S. 115, 130 (1985) ("All citizens are presumptively charged with knowledge of the law"); Ronald D. Rotunda & John E. Nowak, 3 Treatise on Constitutional Law: Substance and Procedure § 17.8(h) (5th 2012) ("When individual interests are . . . affected by legislative action, there is no notice issue, because publication of a statute is normally considered to put all individuals on notice of a change in the law of a jurisdiction."). Accordingly, given 5 U.S.C. § 8421(c), a state court directing a division in connection with a divorce, annulment, or separation, is expected to understand that FERS supplemental annuity will be divided in the same way as annuity pursuant to 5 U.S.C. § 8415.  Both provisions are in the subchapter for "Basic annuity."

that might cause an agency to adopt a new rule – that OPM looked to in answering COBB staff's questions. For that reason, OPM's issuances could not constitute a legislative rule.

The Court of Appeals for this Circuit has observed that only "[a]gency actions that 'impose legally binding obligations or prohibitions on regulated parties' or 'set[ ] forth legally binding requirements for a private party to obtain a permit or license' are legislative rules." Ass'n of Flight Attendants v. Huerta, 785 F.3d 710, 716 (D.C. Cir. 2015), *quoting* Nat'l Mining Ass'n v. McCarthy, 758 F.3d 243, 251-252 (D.C. Cir. 2014). This case does not involve an agency regulating the obligations of private industry or determining how it will handle applications for licenses or permits. Rather, OPM oversees the administration of a well-reticulated statutory system for adjudicating the retirement benefits of Federal employees and their beneficiaries. Fornaro v. James, 413 F.3d 63, 64 (D.C. Cir. 2005). When a Federal employee retires, OPM applies the statutory system and issues a decision calculating the employee's annuity. In some cases, OPM is called upon to apportion the employee's annuity between the new annuitant and a current or former spouse, pursuant to state court orders in divorce, annulment, or separation proceedings.

In making these adjudications OPM is not exercising the sort of judgment an agency might be called upon to use in administering a permitting process, for example. Rather, it is making calculations pursuant to statutory and regulatory provisions published in the United States Code and the Code of Federal Regulations. Although disputes can arise about the underlying math or the correct way to read various provisions, in the end, there can be only one right answer to an annuity calculation. When there is such a dispute, Congress, in order to further accuracy and consistency, provided a mechanism for getting to that right answer. As then-Judge Roberts explained for the D.C. Circuit in Fornaro, "[t]he CSRA specifies the benefits

5

to which federal employees and their survivors are entitled, and provides a reticulated remedial regime for beneficiaries to secure review—including judicial review—of benefits determinations." 416 F.3d at 67. That regime is comprehensive as it "provides for adjudication of all claims by OPM, 5 U.S.C. § 8347(b), appeal of adverse decisions by OPM to the MSPB, *id.* § 8347(d)(1), and subsequent review of MSPB decisions in the Federal Circuit, *id.* § 7703(b)(1); 28 U.S.C. § 1295(a)(9)." Id. And it is exclusive: "A series of opinions from the Supreme Court and this court make clear that these remedial provisions are exclusive, and may not be supplemented by the recognition of additional rights to judicial review having their sources outside the CSRA." Id.

For just the reasons articulated in Fornaro, internal guidance actions such as that taken by OPM here do not require rulemaking under the APA; instead, judicial review of such actions are channeled exclusively through the CSRA's comprehensive scheme. But even if OPM's actions could be regarded as a rule at all, they would, at most, constitute an interpretive rule. As noted in Central Texas Telephone Cooperative v. FCC, 402 F.3d 205, 212 (D.C. Cir. 2005):

> To fall within that category, the rule must be interpreting something. It must derive a proposition from an existing document whose meaning compels or logically justifies the proposition. The substance of the derived proposition must flow fairly from the substance of the existing document." Robert A. Anthony, *"Interpretive" Rules, "Legislative" Rules, and "Spurious" Rules: Lifting the Smog,* 8 ADMIN. L. REV. 1, 6 n. 21 (1994). If, despite an agency's claim, a rule cannot fairly be viewed as interpreting—even incorrectly—a statute or a regulation, the rule is not an interpretive rule exempt from notice-and-comment rulemaking.

OPM's Clearinghouse Memorandum and RIL certainly "derived from . . . an existing document"– 5 U.S.C. § 8421(c) – that OPM management believed compelled the answer it provided. Even if that assumption turns out to be incorrect – a proposition that the proceedings currently pending at the MSPB can eventually resolve— it was not OPM's intent to create new

law.  "Whereas a legislative rule, as an exercise of delegated lawmaking authority, can establish a new rule going forward, an interpretive rule by nature simply communicates the agency's interpretation of what a statute has always meant."  Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives, 920 F.3d 1, 19 (D.C. Cir. 2019).

FLEOA posits that there is a spectrum on which rules fall, exemplified by Guedes at one end and Interport, Inc. v. Magaw, 135 F.3d 826 (D.C. Cir. 1998), at the other, and that rules more similar to the rule discussed in Guedes require notice-and-comment rulemaking.  Pl. Supp. Br. at 12-13.  An examination of these cases, however, demonstrates why OPM's actions were at most "interpretive" in character, and, in any event, did not require notice-and-comment rulemaking.

In Guedes, for example, the Bureau of Alcohol, Tobacco, Firearms & Explosives set out to promulgate a rule classifying bump-stock devices as machine guns.  920 F.3d at 6.  As a result of the new rule, individuals legally holding bump-stock devices in the period before the rule became effective, would become obligated to dispose of them thereafter.  Id. at 8-9.  The Court noted that "[a]ll pertinent indicia of agency intent confirm that the Bump-Stock Rule is a legislative rule," noting that the Rule was creating a prohibition that did not previously exist:

> The Rule unequivocally bespeaks an effort by the Bureau to adjust the legal rights and obligations of bump-stock owners – i.e., to act with the force of law.  Bureau itself treated its action as a legislative rule, publishing in the *Federal Register* under formal notice-and-comment-rulemaking procedures.  The Rule makes clear throughout that possession of bump-stock devices will become unlawful only as of the Rule's effective date, not before.

Id. at 18.  The Court noted that the Rule provided specific information about how to dispose of equipment that was previously legal to possess.  Id.  And it noted that "[t]he Bureau further evinced its intent to exercise legislative authority by expressly invoking the Chevron framework and then elaborating at length as to how Chevron applies to the Rule."  Id.  Although in the subsequent litigation, the Bureau sought to recharacterize the rule as merely interpretive, the

7

Court noted that it knew that "Congress intended a delegation of legislative authority to the agency because Congress made the relevant delegations express," and that the Bureau had expressly referenced that delegation in adopting the rule.

OPM's actions, in contrast, more closely resemble the circumstances in Interport. In that case, an importer of guns challenged a Customs office's requirement that the importer provide a purchase order evidencing a buyer before it could import guns. 135 F.3d at 838. The Government argued that its rule was merely interpretive. The Court agreed, ruling:

> The purchase-order rule neither imposes a new requirement upon nor determines the rights and obligations of the importer; rather, it explains more specifically what is meant in the general rule which, as we said, was the subject of notice-and-comment rulemaking. The purchase order requirement is therefore an interpretive rule and not invalid for want of notice-and-comment pursuant to the APA.

By issuing its guidance to COBB staff, OPM management did not purport to be exercising *legislative* authority, i.e., authority to fill a gap or interpret ambiguous terms. OPM merely sought to respond to their questions and set them on the correct path, i.e., explain what was meant in the statute.

As this Court observed in its November 4, 2019 Memorandum Opinion, if OPM's Clearinghouse Memorandum and RIL do not constitute a "rule" for purposes of APA provisions, "then pre-enforcement review of OPM rulemaking is unlikely to be available through the APA." Id. at 12. Moreover, if FLEOA cannot establish "the availability of pre-enforcement review of OPM rulemaking, preclusion under the CSRA is more likely." Id. Therefore, because FLEOA has not established that OPM's Clearinghouse Memorandum and RIL constituted the promulgation of rules subject to notice-and-comment rulemaking under the APA, its pre-enforcement challenge must fail as a matter of law. Additionally, because FLEOA has not established pre-enforcement review of rulemaking, its claims are precluded under CSRA.

FLEOA acknowledges in its Supplemental Brief that the *only* agency "rules" subject to notice-and-comment rulemaking under the APA are "legislative rules," and that "non-legislative rules" are "exempt from this requirement." Pl.'s Supp. Br. at 6-7. FLEOA also appears to acknowledge that agency action cannot constitute a "legislative rule" if such action does not "create new rights or impose new obligations on regulated parties" (e.g., the agency action does not merely reiterate rights and obligations preexisting under statute or regulation). Id. at 7. For these reasons, FLEOA's argument that OPM's Clearinghouse memo and RIL constitute such a "legislative rule" for purposes of determining APA procedural requirements is a claim unsupported by law or the facts in this case.

The Court of Appeals for this Circuit has held that in order for agency action to constitute a "legislative rule" it must be a "substantive regulatory change to the statutory or regulatory regime," and that action by an agency that "simply clarif[ies] or explains a regulatory term, or confirm[s] a regulatory requirement" does not constitute a "legislative rule." Mendoza v. Perez, 754 F.3d 1002, 1021 (D.C. Cir. 2014).

OPM's Clearinghouse Memorandum and RIL in no way altered the statutory rights or obligations provided 5 U.S.C. § 8421(c). Rather, they constituted internal work instructions that simply reiterated rights and obligations pre-existing under 5 U.S.C. § 8421(c) (i.e., the Clearinghouse Memorandum and RIL explained to OPM employees that 5 U.S.C. § 8421(c) was clear on its face in requiring OPM to treat a FERS annuity supplement "in the same way" as a FERS basic annuity when a court order expressly awards a former spouse an apportionment of a FERS employee annuity).

Nor did the Clearinghouse Memorandum and RIL alter the regulatory regime pre-existing under 5 U.S.C. § 8421(c). To the contrary, they simply explained the meaning of Section

8421(c). Indeed, this interpretation was consistent with pre-existing regulations under 5 C.F.R. § 838.103 because, like 5 U.S.C. § 8421(c), OPM's regulations required OPM to include a retiree's FERS annuity supplement in the division of a court-ordered apportionment in circumstances where a court order expressly divides an "employee annuity"—which is defined by this regulation as consisting of all "recurring payments made under CSRS or FERS to retiree." OPM's actions did not, as FLEOA suggests, alter the rights and obligations that pre-existed for annuitants and former spouses under 5 U.S.C. § 8421(c) and 5 C.F.R. § 838.103.

Although FLEOA is correct that individual annuitants and former spouses may have been affected as a result of OPM taking corrective action in individual cases to ensure compliance with 5 U.S.C. § 8421(c) and 5 C.F.R. § 838.103 (such as receiving unexpected reductions to their annuity payments as a result of OPM paying former spouses the full amount of apportionments they were entitled to receive under 5 U.S.C. § 8421(c) and 5 C.F.R. § 838.103), see Pl.'s Supp. Br. at 9-10, such impact is not determinative of what procedural requirements are necessary under APA provisions. As this Circuit observed in Public Citizens v. Department of State, 276 F. 3d 634, 640 (D.C. Cir. 2002), an agency action cannot be rendered a "legislative rule" for purposes of APA provisions simply because those actions may have produced "harsh effects" on affected parties. Id., citing JEM Broadcasting Co. v. FCC, 22 F.3d 320, 327-28 (D.C. Cir. 1994) (where the court found that FCC 'hard look rules," which required the dismissal of flawed license applications without leave to amend, were "procedural" for purposes of APA requirements, despite their "sometimes harsh effects" on entities subject to this procedure) and Ranger v. FCC, 294 F.2d 240, 243-44 (D.C. Cir. 1961) (where the court found an agency rule establishing a cut-off date for filing of radio license applications to be procedural for purposes of APA provisions "even though the failure to observe the rule cost appellants a radio broadcast

license"). Thus, the consequential effects of OPM's corrective actions taken in individual cases to ensure compliance with 5 U.S.C. § 8421(c) are not determinative as to whether OPM's Clearinghouse Memorandum and RIL are "legislative rules" subject to notice-and-comment rulemaking.

Because the source of the rights and obligations triggering OPM's obligation to take corrective action was 5 U.S.C. § 8421(c), itself, neither OPM's Clearinghouse Memorandum nor RIL originated these rights and obligations. As this Circuit observed "[a] legislative rule '*modifies* or *adds* to a legal norm based on the agency's *own authority*' flowing from a congressional delegation to engage in supplementary lawmaking." Ass'n of Flight Attendants v. Huerta, 785 F.3d 710, 716 (D.C. Cir. 2015), *quoting* Syncor Internat'l Corp. v. Shalala, 127 F.3d 90, 94 (D.C. Cir. 1997) (emphasis added). That clearly was not the case here. Accordingly, there was no "legislative rule" to which a notice-and-comment requirement could be attached.

The cases to which FLEOA cites to in its Supplemental Brief to establish the characteristics of an agency action that would render it a "legislative rule," reflect agency actions far afield from the actions OPM took in this case. See Pl.'s Supp. Br. at 915. The cases FLEOA relies upon to argue that OPM's Clearinghouse Memorandum and RIL should be construed as "legislative rules" involve some sort of *public proclamation* of an agency action or rule. For example, in Guedes, the agency action deemed a "legislative rule" was a firearm rule, which was published by the Bureau of Alcohol, Tobacco, Firearms and Explosives in the *Federal Register* under formal notice-and-comment-rulemaking procedures. 920 F.3d at 6 and 21; see also, Zhang v. U.S. Citizenship & Immigration Services, 344 F. Supp. 3d 32, 41 (D.D.C. 2018) (agency action deemed to be a "legislative rule" constituted "released remarks" by the agency that were made to the public to describe the way in which the agency would interpret "cash"

under 8 C.F.R. § 204.6(e) to determine whether a foreign investor qualifies for an EB-5 Visa); See also, Crop Life Am. v. EPA, 329 F.3d 876, 881,884 (D.C. Cir. 2003) (agency action deemed to be a "legislative rule" was a "Press Release" issued by EPA announcing to the public a directive that EPA would no longer rely on data from third-party human studies for the purpose of determining pesticide safety); Sierra Club v. EPA, 699 F.3d 530, 535 (agency action deemed a "legislative rule" was a "Notice" EPA published in the *Federal Register* declaring that it had completed the requirements necessary to promulgate emission standards required by specific sections of the Clean Air Act). Unlike the agency actions deemed "legislative rules" in these cases, OPM did not publish its Clearinghouse Memorandum or RIL in the *Federal Register*, nor did it make any proclamation to the public of the contents of these documents.

Rather, OPM's actions more closely align with the cases to which FLEOA cites to in its Supplemental Brief, in which courts rejected arguments that the agency action constituted "legislative rulemaking." See id. at 6-15. In Ass'n of Flight Attendants v. Huerta, 785 F.3d 710, 712 and 715-717 (D.C. Cir. 2003), this Circuit found that a Federal Aviation Administration ("FAA") "Notice N89003240" constituted "an *internal* guidance document issued to FAA aviation safety inspectors concerning the use and stowage of portable electronic devices aboard commercial and other aircraft," and thus was not a "legislative rule" for purposes of APA requirements). Similarly, in Cal. Cmtys. Against Toxics v. EPA, 934 F.3d 627, 631 (D.C. Cir. 2019), this Circuit found that an *internal agency memorandum* issued by the Assistant Administrator for the EPA's Office of Air and Radiators to all Regional Air Division Director was not a "legislative rule" for purposes of APA provision, where the agency (much like OPM) determined that a statutory provision (42 U.S.C. § 7412) compelled a certain conclusion, even though prior agency action may not have reflected the clear provisions of that statute. Id. And in

Interport Inc. v. Magaw, 135 F.3d 826 (D.C. Cir. 1998), the Circuit found that a regular practice of the Bureau of Alcohol, Tobacco, and Firearms requiring that entities provide a purchase order along with an application for permission to import firearms into the United States was not a "legislative rule" for purposes of APA provisions.

Much like those cases, OPM's Clearinghouse Memorandum and RIL were merely internal work instructions provided only to OPM's own employees, and were issued only to reiterate the rights and obligations compelled under 5 U.S.C. § 8421(c) and 5 C.F.R. § 838.301. Thus, such actions did not constitute "legislative rulemaking" for purposes of APA provisions.

Furthermore, FLEOA's assertion in its Supplemental Brief that "a court cannot accept an agency's characterization of its own action" in determining whether or not the agency's actions constituted a "legislative rule" is neither universally accepted nor useful here. Id. at 7-8. As this Circuit made clear in Crop Life America v. EPA, 329 F.3d 876, 883 (D.C. Cir. 2003), although not wholly determinative, an important factor to consider in determining whether an agency's action constitutes an attempt to promulgate a legislative rule is the "agency's own characterization of its actions." Id., *citing* Malycorp, Inc. v. EPA, 197 F.3d 543, 545 (D.C. Cir. 1999), and AM. Portland Cement Alliance v. EPA, 101 F. 3d 772, 776 (D.C. Cir. 1996). As a result, this Court must consider OPM's representation that it had no intent to promulgate a "rule" by producing its Clearinghouse Memorandum and RIL; OPM merely intended to provide employees with internal work instructions that ensured compliance with the clear provisions of 5 U.S.C. § 8421(c) and 5 C.F.R. § 838.301.

If OPM had engaged in notice-and-comment rulemaking under this circumstance, such rulemaking would have been an empty exercise because any public comments responding to such a rule—however well-reasoned or rational— would have necessarily gone unheeded for

purely legal reasons given the clear language of Section 8421(c). Because of that clear statutory language, OPM could not have altered the rights and obligations provided to individuals under the provision. OPM's power to regulate does not mean that it can alter clear provisions of law. In fact, in circumstances where OPM has issued regulations that courts have held to contradict statutory provisions, those courts have stuck down such rules as incompatible with those statutory provisions. See, e.g., Killeen v. Office of Personnel Management, 382 F.3d 1316 (Fed. Cir. 2004) (striking down OPM's regulation at 5 C.F.R. § 831.703(f)(2) because this rule contradicted clear statutory provisions under 5 U.S.C. § 8339(p)). OPM, like any other agency, lacks authority to change the meaning of a statute that is clear on its face. See Chevron, 467 U.S. at 842-843 ("First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress").

There is not only nothing to be gained by forcing OPM to undertake a rulemaking at this juncture – three years after OPM started issuing corrective decisions, and after individual claimants have lodged appeals at the MSPB – while there is much to be lost. By suggesting that this Court should require OPM to now conduct notice-and-comment rulemaking, FLEOA is asking to destabilize the CSRA scheme that Congress carefully wrought. For one thing, if erroneous calculations cannot be corrected until OPM completes a notice-and-comment rulemaking, and if, as FLEOA also argues, OPM may not apply any new regulation resulting from that rulemaking retroactively, OPM would be precluded from rectifying the failure to divide FERS annuity supplements prior to the rulemaking.

Such an outcome would impose hard, real-world costs. It would leave spouses entitled to a division for past periods with no remedy for those lost amounts -- unless, of course, they seek

relief at the MSPB and receive a conflicting decision, which presents an entirely different problem, as noted in defendants' prior briefs. Thus, adopting FLEOA's argument would mean adopting the view that the past errors of OPM operational staff can extinguish the legitimate claims of spouses and former spouses as to amounts that should have been paid in the past.

This outcome would constitute just the sort of estoppel by end run that the Supreme Court eschewed in Office of Personnel Management v. Richmond, 496 U.S. 414, 415-429 (1990). Congress clearly did not intend that result. It intended that the MSPB and its reviewing courts resolve disputes by reaching final, binding decisions thorough the claim channeling scheme of the CSRA, so that OPM can move forward and make any necessary corrections in accordance with applicable law, as finally determined by the entities charged by Congress with reviewing OPM's decisions. FLEOA's argument would upend this scheme.

**II.     The Court should dismiss FLEOA's claim seeking to bar retroactive corrections because OPM's actions in issuing corrective guidance and taking corrective actions were both warranted and necessary under applicable law.**

As noted in Defendants' Supplemental Brief, at 12-13, OPM is obligated to follow clear provisions of law. The Supreme Court held in Richmond that OPM may not pay benefits not otherwise authorized by law, even in situations where an OPM employee has provided misinformation or engaged in administrative error that causes an individual to forego a valuable right or change positions for the worse. 496 U.S. 414, 415-429. Moreover, "OPM administers the payment of survivor annuities from the Civil Service Retirement and Disability Fund, and may recover an overpayment made to an individual who is not entitled to the benefits." King v. Office of Personnel Management, 730 F.3d 1343, 1347 (Fed. Cir. 2013), *citing* 5 U.S.C. §§ 8347(a), 8348(a); 31 U.S.C. § 3711(a)(1). As the King decision further observed, "[i]n certain circumstances, recovery of an overpayment may be waived when the individual is without fault

15

and recovery would be 'against equity and good conscience.' 5 U.S.C. § 8470(b); 5 C.F.R. § 831.1401." Otherwise, OPM, like other Federal agencies, is expected to "aggressively collect all debts arising out of activities of . . . that agency." 31 C.F.R. § 901.1

> III. **The Court should dismiss FLEOA's request that the Court rule that OPM's actions were arbitrary, capricious or contrary to law because claims arising from OPM's actions are governed by the CSRA and identical relief is already available to FLEOA's members under that statute.**

Finally, FLEOA argues in its Supplemental Brief that in the event this Court finds that OPM's actions did not constitute a "legislative rule," this Court would nevertheless have discretion to alternatively rule on FLEOA's claim that OPM's actions were arbitrary and capricious. Id. at 1-2 and 18. Such a ruling would upend the carefully calibrated claims-channeling scheme that Congress created under CSRA.

As then-Judge Roberts explained in Fornaro, "[a]llowing district court actions challenging how OPM calculates civil service benefits for particular classes of beneficiaries would plainly undermine the whole point of channeling review of benefits determinations to the MSPB and from there to the Federal Circuit." 416 F.3d at 406. Rather than furthering Congress's intent to channel administrative and judicial review of virtually all personnel actions through a single comprehensive process, "[s]uch an approach would reintroduce 'the haphazard arrangements for administrative and judicial review of personnel action,' involving resort 'to the district courts ... through various forms of action ..., including suits for mandamus, injunction, and declaratory judgment,' that Congress sought to replace in the CSRA. Id. at 406-407 (*quoting* United States v. Fausto, 484 U.S. 439, 444 (1988) (citations omitted). And "[i]t would erode 'the primacy of the MSPB for administrative resolution of disputes . . . and the primacy of the Federal Circuit for judicial review.'" Id. at 407 (*quoting* Fausto, at 449). As this Circuit concluded, "[a]llowing the present action to proceed would also impermissibly create a right of 'access to

16

the courts more immediate and direct than the [CSRA] provides,' *Carducci* [v. Regan,] 714 F.2d [171,] at 174 [(D.C. Cir. 1983)], thus fracturing 'the unifying authority . . . of the MSPB,' and 'undermining the consistency of interpretation by the Federal Circuit envisioned' by the Act." Id. (*quoting* Fausto, at 451). Nothing about the fact that FLEOA's action is a systemic challenge to OPM policy mitigates this impact.

Although Fornaro did not involve a claim directly alleging a failure to follow notice-and-comment rulemaking, it did involve a claim asserted under the APA, and its sweeping language requires dismissal of FLEOA's argument that the Court should review this action to determine whether it was arbitrary, capricious, or contrary to law. As this Court observed in its Memorandum Opinion, to establish district court jurisdiction over FLEOA's claims, FLEOA must first establish that its pre-enforcement challenge is cognizable under APA provisions. If FLEOA fails on this front, this Court should dismiss FLEOA's claims as barred under the CSRA and may not otherwise reach FLEOA's claims as to whether OPM's actions were arbitrary and capricious under the circumstances.

Under 5 U.S.C. § 8461(e), "an administrative action or order" by OPM "affecting the rights or interests of an individual . . . under the provisions of this chapter administered by the Office may be appealed to the Merit Systems Protection Board under procedures prescribed by the(b)(1)." In the appeal filing, the appellant is asked to submit "[a] statement of the reasons why the appellant believes the agency action is wrong." 5 C.F.R. § 1201.24(a)(4). The agency is asked, in response to identify the action taken and state the reasons why it was taken. Id. at § 1201.25. MSPB judges are expected to "conduct fair and impartial hearings and . . . issue timely and clear decisions based on statutes and legal proceedings." Id. at § 1201.41(b). Judges have "all powers necessary to that end" including the ability to "[r]equire the parties to file

memoranda of law and to present oral argument with respect to any question of law." Id. at §1201.41(b)(13). In an appeal from an agency decision, the MSPB may sustain agency action only if the decision is supported by a preponderance of the evidence. 5 U.S.C. § 7701(c)(1); 5 C.F.R. § 1201.56(b)(2)(ii). The Board is required to reverse agency action – even where the agency meets that evidentiary standard – if the appellant shows that the decision was not in accordance with law. 5 U.S.C. § 7701(c)(2)(C). 5 C.F.R. §1201.56(c)(3).[2]

The Federal Circuit has jurisdiction to review MSPB decisions in civil service retirement appeals under 5 U.S.C. § 7703(b)(1). Cheeseman v. OPM, 791 F.2d 138, 139-40 (Fed. Cir. 1986). In any such case:

> the court shall review the record and hold unlawful and set aside any agency action, finding s, or conclusions found to be:
> (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
> (2) obtained without procedures required by law, rule, or regulation having been followed; or
> (3) unsupported by substantial evidence.

5 U.S.C. § 7703(c).

Thus, any individual affected by the OPM actions underlying this case (like Mr. Moulton, Mr. Kuebbeler, and the many others who have lodged appeals at the MSPB) may test the validity of OPM's conclusion and can obtain relief, if appropriate, through the CSRA. The MSPB and its reviewing courts have expertise with respect to retirement claims and the MSBP and its reviewing courts will be able to construe 5 U.S.C. § 8421(c), the statute eventually produce a single, conclusive answer. As part of their review, these entities are well within their authority to find that OPM's actions in this circumstance are "arbitrary and capricious" or contrary to law if

---

[2] Where OPM proves by preponderant evidence an overpayment of benefits, an appellant may prove, by substantial evidence . . . eligibility for waiver or adjustment." 5 C.F.R. § 1201.56(b)(2)(ii).

they deem that doing so would be appropriate. Similarly, if after a challenge to OPM's actions at the MSPB and its reviewing courts, OPM's answer turns out to be wrong, OPM will proceed in accordance with final decisions in those proceedings. As FLEOA is aware, affected parties are made available of this recourse when OPM operational staff apply the statute to individual cases in new decisions recalculating the apportionment.

For that reason, even if the Court determines, contrary to defendants' view, that it is not "fairly discernible," under the analysis in Thunder Basin Coal Co. v. Reich, 510 U.S. 200, 207, 2016 (1994), that Congress intended under to limit review of FLEOA's claim as to pre-enforcement review of a legislative rule to CSRA review, FLEOA's request that this Court hold that OPM's actions were arbitrary, capricious, or contrary to law can produce no remedy that the individuals on behalf of whom FLEOA sued cannot obtain under the CSRA. Accordingly, that claim must be dismissed.

## CONCLUSION

Consequently, this Court should dismiss FLEOA's APA pre-enforcement claims, and should otherwise dismiss FLEOA's petition as precluded under 5 U.S.C. § 704 and barred by the CSRA. Alternatively, this Court should suspend proceedings related to FLEOA's APA pre-enforcement claims to allow the MSPB and its reviewing courts to rule on appeals currently pending before it related to OPM's administration of 5 U.S.C. § 8421(c).

    Respectfully submitted,

    JESSIE K. LIU, D.C.
    D.C. Bar # 472845
    United States Attorney
     for the District of Columbia

DANIEL VAN HORN,
D.C. Bar #924092
Chief, Civil Division

*/s/ Marina Utgoff Braswell*
MARINA UTGOFF BRASWELL,
D.C. Bar #416587
Assistant United States Attorney,
U.S. Attorney's Office - Civil Division
555 4th Street, N.W.
Washington, D.C.  20530
Tel: (202) 252-2561
Marina.Braswell@usdoj.gov